## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| KNH Aviation Services, Inc. d/b/a | ) | Case # 15-01641-dd |
| AvCraft Technical Services, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Michelle L. Vieira as Chapter 7 Trustee for | ) | |
| KNH Aviation Services, Inc. d/b/a AvCraft | ) | |
| Technical Services, | ) | |
| | ) | Adv. Pro. No.          15-80170-dd |
| Plaintiff, | ) | |
| | ) | Consolidated With |
| vs. | ) | Adv. Pro. Nos.        15-80171-dd |
| | ) |                                  15-80178-dd |
| Michael Hill; Donald Kamenz; Derek Nice; | ) |                                  15-80179-dd |
| Carol Drew; and Jesper Lundberg, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### AMENDED COMPLAINT[1]

Michelle L. Vieira ("Trustee"), as Chapter 7 Trustee for KNH Aviation Services, Inc. d/b/a AvCraft Technical Services ("Debtor"), hereby alleges against Michael Hill ("Hill"); Donald Kamenz ("Kamenz"); Derek Nice ("Nice"); Carol Drew ("Drew"); and Jesper Lundberg ("Lundberg"), the following[2]:

### PARTIES

1. Trustee is the Chapter 7 Trustee of the Debtor, appointed on March 24, 2015, and brings this action on behalf of the Debtor and/or the creditors of the Debtor.

2. Hill is a citizen and resident of Georgetown County, South Carolina.

---

[1] This amends and consolidates the following: (1) the Complaint filed against Defendant Hill at Docket 1 in Adv. Pro. No. 15-80178-dd; (2) the Complaint filed against Defendant Kamenz at Docket 1 in Adv. Pro. No. 15-80179-dd; (3) the Complaint filed against Defendant Lundberg at Docket 1 in Adv. Pro. No. 15-80171, and (4) the Amended Complaint filed at Docket 6 in Adv. Pro. No. 15-80170-dd.

[2] See footnote 1.

3. Kamenz is a citizen and resident of Palm Beach County, Florida.

4. Drew is a citizen and resident of Burlington, Ontario, Canada.

5. Nice is a citizen and resident of Burlington, Ontario, Canada.

6. Lundberg is a citizen and resident of Billund, Denmark (Hill, Kamenz, Drew, Nice and Lundberg, collectively, hereafter referred to as "Defendants").

## JURISDICTION

7. This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001.

8. On March 24, 2015 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of South Carolina (the "Bankruptcy Court"), Case No. 15-01641-dd (the "Bankruptcy").

9. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334, 157, and Local Civil Rule 83.IX.01 DSC.

10. This is a core proceeding by virtue of 28 U.S.C. § 157(b)(2)(A) and (O).

11. The Bankruptcy Court has the authority to enter a final order in this matter.

12. Trustee consents to the entry of final order or judgment by the Bankruptcy Court.

## BACKGROUND

13. The Debtor was formed in 2007 upon the filing of the Certificate of Incorporation in the State of Delaware.

14. Hill was the initial director of the Debtor.

15. At some time after its incorporation, Kamenz, Nice and Drew each joined Hill as directors of the Debtor.

16. Hill, Kamenz, Nice, and Drew (the "Original Directors") have been directors and

officers of the Debtor since at least September 2010.

17. The Original Directors, through various entities, are also the owners of the Debtor and have been since at least September 2010.

18. Lundberg is an officer of Sun Air of Scandinavia A/S ("Sun Air").

19. Lundberg became a director of the Debtor in February 2012, as part of a transaction between the Debtor and Sun Air.

20. Lundberg, through an entity known as YJM Aviation, LLC ("YJM"), and Hill, through an entity known as Flying Low LLC ("Flying Low"), are also partners in CCS Aviation, LLC ("CCS"), and, upon information and belief, have been since 2011.

21. CCS remains an active company involved in the airline industry.

22. Nice and Drew are the owners of Consilium Technica, Inc., formally known as Indaer International ("Consilium), which is also engaged the airline industry.

23. Consilium is a 50% owner of the Debtor.

*Undercapitalization and Insolvency of the Debtor*

24. Upon information and belief, the Debtor had little or no business operations prior to September 2010.

25. On September 30, 2010, the Debtor entered into an agreement wherein it purchased certain assets of AvCraft Support Services, Inc. ("AvCraft"), and some of AvCraft's related entities, through a foreclosure sale conducted by Maple Bank GmbH ("Maple").

26. Maple financed the transaction in the amount of $700,000.

27. In conjunction with the purchase of these assets, the Debtor's owners made equity

investments into the Debtor in the amount of $50,000 each, for a total equity investment of $200,000.

28. The four owners each also made loans to the Debtor in the amount of $100,000 each, for a total of $400,000 in loans.

29. By the end of 2010, the Debtor was undercapitalized with approximately $200,000 in capital and $1.1 million in debt.

30. In the years that followed, the Debtor was unable to produce sufficient cash flow to sustain its operations.

31. The Debtor was insolvent as of the end of 2010 and remained insolvent up until the Petition Date.

32. As a result of the insolvency of the Debtor, the Defendants' fiduciary duties were to the creditors of the Debtor.

33. The creditors of the Debtor reasonably relied on the good faith of the Defendants in their fiduciary capacities.

34. Despite the continuing need for additional capital, the Original Directors and, after February 2012, the Defendants did not recommend that the owners infuse additional capital to properly capitalize the Debtor.

35. The Original Directors and, after February 2012, the Defendants failed to make properly informed management decisions and/or were grossly negligent in their failure to recommend to the owners that an infusion of additional capital was necessary or advisable.

36. The Original Directors acted in their own self interests in not recommending that the owners infuse additional capital, because they themselves were the owners

and did not want to risk their own funds over the creditors' funds, and they did not want to bring in an additional partner which might dilute their ownership interests.

37. Lundberg acted in his own self interests in not recommending that the owners infuse additional capital, because he was beholden to Hill as a result of the outside business relationship and ownership of CCS between Lundberg and Hill.

38. The Defendants engaged in corporate waste through insider loans at exorbitant interest rates.

39. The Original Directors made payments to the owners on an annual basis for which corresponding services were not performed.

40. Payments to owners were made at a time that non-insider creditors were not being paid.

41. Payments of insider loans were made without paying essential creditors, including the Debtor's landlord.

42. Payments to Consilium, an insider, were made without corresponding services to the Debtor and at a time that non-creditor insiders were not being paid.

43. The Original Directors and, after February 2012, the Defendants abdicated their duty to be informed and/or were wholly disregarding the financial information to which they had access.

44. The Original Directors and, after February 2012, the Defendants engaged in corporate waste as further set forth herein which contributed to the insolvency and undercapitalization of the Debtor, to the detriment of the creditors of the Debtor.

45. The Original Directors and, after February 2012, the Defendants did not consider

and/or fully disregarded the impact of neglecting the non-insider creditors while favoring the insiders.

*Debtor's Sale of Equipment to Sun Air*

46. On or around November 22, 2011, the Debtor entered into an Equipment Purchase and Leaseback Agreement (the "Sale Agreement") with Sun Air, which states that the Debtor sold certain tooling and equipment to Sun Air for a purchase price of $200,000.

47. At the time that the Debtor and Sun Air entered into the Sale Agreement, the equipment subject to the Sale Agreement was worth at least $356,000.

48. Kamenz, Hill, and Nice executed a corporate resolution, a true and correct copy of which is attached hereto as <u>Exhibit A</u> and incorporated herein by reference, dated November 21, 2011, approving the Sale Agreement.

49. The Sale Agreement caused the Debtor to purportedly transfer ownership of equipment, which was for substantially less than its fair market value.

50. The Defendants caused the Debtor to engage in corporate waste through the Sale Agreement in that there was an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which a reasonable person might be willing to trade.

*Debtor's Lease of Equipment from Sun Air*

51. On or around November 22, 2011, the Debtor entered into an Equipment Lease with Option to Purchase (the "Lease Agreement"), which states that the Debtor leased certain tooling and equipment from Sun Air.

52. Upon information and belief, the Lease Agreement was for the same tooling and

equipment which the Debtor sold to Sun Air pursuant to the Sale Agreement.

53. The Lease Agreement provided that the Debtor would make monthly rent payments to Sun Air in the amount of $2,500 for ten (10) years.

54. Upon information and belief, ten years is longer than the remaining economic life of the tooling and equipment which was the subject of the lease.

55. The Lease Agreement also contained a provision that required the Debtor to add Lundberg to its Board of Directors.

56. At the February 23, 2012 meeting of the Debtor's Board of Directors, the Original Directors unanimously elected Lundberg to the Board of Directors, as indicated by the minutes of such meeting, a true and correct copy of which are attached hereto as Exhibit B and incorporated herein by reference.

57. The Lease Agreement resulted in the Debtor purportedly leasing back equipment, which it had previously owned, for longer than the remaining useful life of the equipment.

58. The Lease Agreement resulted in the Debtor being required to pay $500,000 for ownership of equipment that it had sold for $200,000.

59. The Sale Agreement and Lease Agreement (together, the "Sale/Lease Agreement") constitute a disguised lending arrangement and secured transaction.

60. The true nature of the Sale/Lease Agreement was a loan in the principal amount of $200,000, with 15% simple interest due for ten (10) years, and a balloon payment of principal in the amount of $200,000 at the end of the ten-year term, secured by the tooling and equipment.

61. As a result of the Sale/Lease Agreement, Sun Air loaned funds to the Debtor and

obtained a security interest in the tooling and equipment.

62. Sun Air's security interest in the tooling and equipment is not properly perfected and is avoidable by the Trustee.

63. As a result of the Sale/Lease Agreement, the tooling and equipment never moved from its location at the Debtor's facilities.

64. The Sale/Lease Agreement was intentionally designed to be a camouflaged transaction which, by its nature, concealed the true nature of transaction from the creditors of the Debtor and those not privy to the actions of the Board of Directors.

65. The true nature of the Sale/Lease Agreement was undiscoverable by the creditors of the Debtor and inherently unknowable as there were no objective factors to put the creditors on notice of injury.

66. The Sale/Lease Agreement was self-serving to the interests of the Original Directors and Defendants because it hid the true financial condition of the Debtor from the Debtor's creditors.

67. Upon information and belief, the Original Directors did not inform themselves of all material information concerning the Sale/Lease Agreement before entering into the transaction and were grossly negligent in doing so.

68. The Defendants' decision making process in entering into the Sale/Lease Agreement was grossly negligent and/or uninformed in that the terms required the purported "sale" of the Debtor's assets for inadequate consideration, the payment of rent for the same equipment over an extended period of ten years, with the resulting loss of said assets at the end of ten years unless the Debtor repaid the

same purchase amount to Sun Air.

69. The Original Directors were personally interested in the Sale/Lease Agreement transaction in that it allowed the Debtor to receive operating funds without the owners having to contribute personal funds; it allowed for the temporary continuing operations of the Debtor so that the owners could continue to receive payments from the Debtor at the expense of the creditors; and it camouflaged the true condition of the Debtor which might otherwise expose the Original Directors to liability; among other reasons.

70. Lundberg was personally interested in the Sale/Lease Transaction because he was an officer of Sun Air and also because he was beholden to Hill as a result of their joint ownership interest in CCS.

71. The Defendants acted in bad faith in entering into the Sale/Lease Agreement by consciously disregarding their responsibilities as Directors to act in the best interests of the Debtor.

72. The Defendants caused the Debtor to engage in corporate waste through the Sale/Lease Agreement in that there was an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which a reasonable person might be willing to trade

*Sun Air's Recovery of the Equipment*

73. On or around March 3, 2015, Hill sent correspondence to Sun Air, a true and correct copy of which is attached hereto as <u>Exhibit C</u> and incorporated herein by reference, advising Sun Air that the Debtor wanted to "see Sun Air's rights and interests in its machinery and equipment protected."

74. The correspondence further advised that bankruptcy might be imminent and that Sun Air should remove the tooling and equipment subject to the Lease Agreement no later than March 22, 2015.

75. On or about March 22, 2015, Lundberg, on behalf of Sun Air and with the cooperation and assistance of the Debtor, removed several shipping containers of tooling and equipment from the Debtor's premises.

76. The tooling and equipment was shipped to Denmark immediately after its removal.

77. The Bankruptcy was filed two days later, but the bankruptcy schedules indicating equipment removal were not filed until April 7, 2015. Even then, identification of the equipment which had been removed was insufficient.

78. Upon information and belief, the separate business relationship between Hill and Lundberg with CCS contributed to Hill's attempt to protect the interests of Sun Air.

79. Upon information and belief, Hill was beholden to Lundberg due to the separate business relationship with CCS, and this separate business relationship with Lundberg clouded Hill's judgment.

80. The Trustee's attempts to recover the removed assets from Sun Air have been made significantly more difficult due to the fact that Sun Air is a business entity organized and doing business outside of the United States, and the Trustee has filed litigation against Sun Air to recover these assets.

81. By allowing Sun Air to remove this property prior to the bankruptcy filing, the Defendants caused the Debtor to lose hundreds of thousands of dollars in valuable

assets which could have been used to benefit the bankruptcy estate.

82. Upon information and belief, the Defendants did not inform themselves of all material information concerning the removal of assets by Sun Air and were grossly negligent in allowing Sun Air to remove the assets.

83. The Defendants' decision-making process in allowing Sun Air to remove the assets was grossly negligent and/or uninformed in that bankruptcy was imminent and in light of the true nature of the transaction with Sun Air.

84. Lundberg was personally interested in Sun Air's removal of the assets due to his position with Sun Air.

85. Hill was personally interested in Sun Air's removal of the assets due to his separate business relationship with Lundberg with CCS and the fact that he was beholden to Lundberg as a result of that relationship.

86. The Defendants acted in bad faith in allowing Sun Air to remove the assets by consciously disregarding their responsibilities as Directors to act in the best interests of the Debtor.

87. The Defendants caused the Debtor to engage in corporate waste in allowing Sun Air to remove the assets in that there was an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which a reasonable person might be willing to trade.

88. The Debtor failed to report to the Trustee, for several weeks post-petition, that Sun Air had removed the assets.

*Loans from Insiders to the Debtors*

89. On or after February 23, 2012 until the Petition Date, Defendants caused the

Debtor to borrow an additional $208,000 from Hill, which it booked as "Accounts Receivable Advances," and the Original Directors caused the Debtor to borrow another $60,000 from Hill prior to February 23, 2012.

90. On or after February 23, 2012 until the Petition Date, the Defendants caused the Debtor to borrow an additional $60,000 from Kamenz, which it booked as "Accounts Receivable Advances."

91. On or after February 23, 2012 until the Petition Date, the Defendants caused the Debtor to borrow an additional $363,843.07 from Consilium, which it booked as "accounts receivable advances."

92. Hill, Kamenz, and Consilium are all directors and officers of the Debtor, or are owned by directors and officers of the Debtor.

93. All of these loans were unsecured loans, although they purported to be secured by accounts receivable.

94. All of these advances were repaid, with accrued interest and financing fees, within a few months of being made.

95. The Debtor has many non-insider creditors which have not been paid and which existed prior to the unsecured claims of Hill, Kamenz, and Consilium.

96. The Defendants caused the Debtor to repay advances from insiders, with high interest rates and expensive financing fees, prior to repaying the Debtor's non-insider creditors.

97. Upon information and belief, the Defendants did not inform themselves of all material information concerning the repayment of these insider loans prior to repaying the Debtor's non-insider creditors and were grossly negligent in doing

so.

98. The Defendants' decision making process in entering into and repayment of the insider loans was grossly negligent and/or uninformed in that the Debtor paid high interest rates and expensive financing fees for the insider loans, and the Debtor paid insiders prior to non-insider creditors.

99. Hill, Kamenz, Nice and Drew were personally interested in the repayment of the insider loans in that they personally benefited from such payments.

100.     Lundberg was personally interested in the repayment of the loan to Hill due to his separate business relationship with Hill with CCS and the fact that he was beholden to Hill as a result of such relationship.

101.     The Defendants acted in bad faith in entering into the insider loans in light of the terms of such loans; in repaying the insider loans prior to repaying the Debtor's non-insider creditors; and by consciously disregarding their responsibilities as Directors to act in the best interests of the Debtor.

102.     The Defendants caused the Debtor to engage in corporate waste through these insider loans due to the high interest rate and financing fees, and in the repayment of these loans ahead of non-insider creditor debts.

*KNH Air Logistics, LLC*

103.     On or around August 3, 2012, the Original Directors created KNH Air Logistics, LLC ("Logistics") and were then, and still remain, the owners of Logistics either directly or through other entities.

104.     Logistics used the Debtor's hangars, employees, and tooling and equipment to remove parts from aircraft and then sell those parts to the Debtor.

105.     Logistics did not maintain a separate premises or separate employees from the Debtor.

106.     Logistics did not pay the Debtor for the use of the Debtor's hangars nor for the use of its employees.

107.     Logistics did not perform any services which the Debtor was not capable of performing.

108.     From Logistics' creation until the Petition Date, Logistics received $27,485.50 from the Debtor.

109.     Logistics further injured the Debtor's business by performing services for third parties which the Debtor was capable of performing and which the Debtor routinely performed.

110.     The Debtor paid the expenses of Logistics, resulting in the profit being paid to Logistics while the debt remained with the Debtor.

111.     Upon information and belief, the Original Directors did not inform themselves of all material information concerning the creation and utilization of Logistics and were grossly negligent in doing so.

112.     The Defendants' decision making process in creating and utilizing Logistics was grossly negligent and/or uninformed in that Logistics used the Debtor's assets and employees without remuneration to the Debtor, Logistics did not perform any services which the Debtor could not perform itself, and the Debtor paid Logistics for such services which it could have performed itself.

113.     The Original Directors were personally interested in the creation and utilization of Logistics in that they stood to receive a personal benefit as owners

of Logistics.

114.     The Original Directors acted in bad faith in creating and utilizing Logistics by consciously disregarding their responsibilities as Directors to act in the best interests of the Debtor.

115.     The Defendants caused the Debtor to engage in corporate waste through the creation and utilization of Logistics in that there was an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which a reasonable person might be willing to trade.

*Removal of Assets by Hill*

116.     Prior to the Petition Date, Hill removed several airplane parts belonging to the Debtor and valued at approximately $60,000 from the Debtor's facilities and stored them at his personal residence.

117.     The removal of these assets was not initially disclosed on the Debtor's bankruptcy schedules.

118.     The removal of these assets was not initially disclosed to the Trustee.

119.     There was no legitimate business reason to remove the assets from the Debtor's hangars to Hill's residence.

120.     Upon discovery of such removal, the Trustee requested that Hill return the assets to the hangars but Hill refused.

121.     There was no legitimate business reason to fail and refuse to return the assets to the Debtor's hangars once it was determined that the Debtor was going to file for bankruptcy.

122.     Once the removal was disclosed to the Trustee, the Trustee was required

to coordinate the return of these assets to the Debtor's premises and to pay for their recovery from Hill's residence.

123.     Hill was grossly negligent in removing the assets that belonged to the Debtor.

124.     Hill was personally interested in his removal of the Debtor's assets in that he stood to receive a personal benefit from the assets.

125.     Hill acted in bad faith in removing the assets by consciously disregarding his responsibilities as a Director to act in the best interests of the Debtor.

126.     Hill caused the Debtor to engage in corporate waste through the removal of these assets.

*Preference Payments as to Hill*

127.     Hill is an insider of the Debtor as that term is defined by 11 U.S.C. § 101(31)(B).

128.     On or within one year before the Petition Date, that is between March 24, 2014 through and including March 24, 2015 (the "Preference Period"), the Debtor continued to operate its business affairs, including the transfer of property, either by checks, cashier checks, wire transfers, direct deposit or otherwise to certain payees, including Hill.

129.     The Debtor made loan repayments to Hill during the Preference Period in an amount not less than $44,286.10 (the "Loan Repayments")

130.     These payments were on account of unsecured loans made by Hill to the Debtor and were made directly to or for the benefit of Hill.

131.     In February 2015, Hill submitted expense reports to the Debtor from June 2014 through January 2015 and received payments from the Debtor in an amount not less than $16,217.85 (the "Expense Report Payments") (the Loan Repayments and Expense Report Payments are collectively referred to as the "Hill Transfers").

132.     The Debtor was insolvent at all times during the Preference Period within the meaning of Bankruptcy Code, in that the sum of its debts was greater than the value of its assets.

*Preference Payments as to Kamenz*

133.     Kamenz is an insider of the Debtor as that term is defined by 11 U.S.C. § 101(31)(B).

134.     During the Preference Period, the Debtor continued to operate its business affairs, including the transfer of property, either by checks, cashier checks, wire transfers, direct deposit or otherwise to certain payees, including Kamenz.

135.     The Debtor distributed funds to Kamenz, during the Preference Period in an amount not less than $36,903.67 (the "Kamenz Transfers").

136.     These transfers were on account of unsecured loans made by Kamenz to the Debtor and were made directly to or for the benefit of Kamenz.

137.     The Debtor was insolvent at all times during the Preference Period within the meaning of Bankruptcy Code, in that the sum of its debts was greater than the value of its assets.

### FOR A FIRST CAUSE OF ACTION
**(Breach of Fiduciary Duties of Care by Defendants re: Capitalization and Insolvency of the Debtor)**

138.     The Trustee repeats and realleges the allegations contained in the

preceding paragraphs as if fully set forth verbatim herein.

139.     As directors of the Debtor, the Defendants owed the Debtor fiduciary duties of care, which required Defendants to make informed business decisions and act with the care that a reasonably prudent person in a like position would exercise under similar conditions.

140.     This fiduciary duty was also owed to the creditors as a result of the Debtor's insolvency.

141.     The owners of the Debtor have only been required to invest $200,000 in capital, which was invested in September or October 2010.

142.     At the time that the owners invested the capital, they also loaned the Debtor $400,000 (the "Initial Loans").

143.     Further, at the time that the owners invested the capital, the Debtor had an obligation to Maple Bank in the amount of $700,000.

144.     As of the end of 2010, the Debtor had capital of $200,000 and debt of $1.1 million.

145.     Since the end of 2010 and continuing thereafter, the Debtor has not had enough cash flow to sustain its operations.

146.     Since the end of 2010 and continuing thereafter, the Debtor has been insolvent and has never been properly capitalized.

147.     A reasonably prudent person would have required the owners to properly capitalize the Debtor and the Defendants were grossly negligent in failing to recommend that the owners properly capitalize the Debtor in late 2010 and in each fiscal quarter thereafter as the financial information reflected that the Debtor

continued in a state of insolvency and failed to produce adequate cash flow to sustain its operations.

148.     Upon information and belief, the Defendants failed to inform themselves, before making business decisions, of all material information reasonably available to them, including the option of a capital call by the owners.

149.     The Defendants had a duty to the Debtor and its creditors to advise that the owners properly capitalized the Debtor but they did not do so.

150.     The Debtor's undercapitalization required that the Debtor seek financing from alternative sources and led the Defendants to make further damaging financial decisions for the Debtor, such as the Sale Agreement and the Lease Agreement with Sun Air and the multiple loans from insiders which were repaid ahead of all other creditors.

151.     By failing to insure that the Debtor was adequately capitalized, the Defendants breached their fiduciary duties of care.

152.     The Defendants caused the Debtor to engage in corporate waste as set forth herein which further contributed to the insolvency and under capitalization of the Debtor.

153.     The corporate waste was the result of exchanges so one sided that no business person of ordinary, sound judgment could conclude that the Debtor received adequate consideration.

154.     The Defendants are liable for the corporate waste which they permitted to occur.

155.     In their actions, the Defendants did not exercise proper business judgment

because they acted with gross negligence as set forth herein, they were self-interested as set forth herein, and/or they acted in bad faith as set forth herein.

156.    As a result of these breaches of fiduciary duty and corporate waste, the Debtor has suffered damages for which the Defendants are liable.

## FOR A SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duties of Care by the Original Directors re: Sun Air Sale Agreement)

157.    The Trustee repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth verbatim herein.

158.    As directors of the Debtor, the Original Directors owed the Debtor fiduciary duties of care, which required the Original Directors to make informed business decisions and act with the care that a reasonably prudent person in a like position would exercise under similar conditions.

159.    This fiduciary duty was also owed to the creditors as a result of the Debtor's insolvency.

160.    Pursuant to the Sale Agreement, the Debtor sold essential tooling and equipment to Sun Air for at least $156,000 less than fair market value.

161.    A reasonably prudent person would not have caused the Debtor to enter into the Sale Agreement and the Original Directors were grossly negligent in allowing the Debtor to enter into the Sale Agreement.

162.    By causing the Debtor to enter into the Sale Agreement, the Original Directors breached their fiduciary duties of care.

163.    In their actions, the Original Directors did not exercise proper business judgment because they acted with gross negligence as set forth herein, they were

self-interested as set forth herein, and/or they acted in bad faith as set forth herein.

164.     As a result of these breaches of fiduciary duty, the Debtor has suffered

damages for which the Original Directors are liable.

### FOR A THIRD CAUSE OF ACTION
**(Breach of Fiduciary Duties of Care by the Original Directors re: Sun Air Lease
Agreement)**

165.     The Trustee repeats and realleges the allegations contained in the

preceding paragraphs as if fully set forth verbatim herein.

166.     As directors of the Debtor, the Original Directors owed the Debtor

fiduciary duties of care, which required the Original Directors to make informed

business decisions and act with the care that a reasonably prudent person in a like

position would exercise under similar conditions.

167.     This fiduciary duty was also owed to the creditors as a result of the

Debtor's insolvency.

168.     The Original Directors sold a substantial portion of the Debtor's essential

tooling and equipment to Sun Air pursuant to the Sale Agreement.

169.     As a result, the Debtor entered into the Lease Agreement wherein it leased

back that same tooling and equipment with an option to purchase.

170.     The Lease Agreement required the Debtor to pay $500,000 over the course

of ten years for tooling and equipment which the Debtor sold for $200,000.

171.     A reasonably prudent person would not have caused the Debtor to enter

into the Lease Agreement and the Original Directors were grossly negligent in

allowing the Debtor to enter into the Lease Agreement.

172.     By causing the Debtor to enter into the Lease Agreement, the Original

Directors breached their fiduciary duties of care.

173.    In their actions, the Original Directors did not exercise proper business judgment because they acted with gross negligence as set forth herein, they were self-interested as set forth herein, and/or they acted in bad faith as set forth herein.

174.    As a result of these breaches of fiduciary duty, the Debtor has suffered damages for which the Original Directors are liable.

## FOR A FOURTH CAUSE OF ACTION
**(Breach of Fiduciary Duty of Care by Hill and Lundberg re: Sun Air Removal of Equipment)**

175.    The Trustee repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth verbatim herein.

176.    As of February 23, 2012 and continuing until the present, Lundberg was and is an officer of Sun Air.

177.    As directors and/or officers of the Debtor, Hill and Lundberg each owed the Debtor a fiduciary duty of care, which required Hill and Lundberg to make informed business decisions and act with the care that a reasonably prudent person in a like position would exercise under similar conditions.

178.    This fiduciary duty was also owed to the creditors as a result of the Debtor's insolvency.

179.    Upon becoming aware that the Debtor would probably be filing bankruptcy very soon, Hill contacted Lundberg and warned him that Sun Air should remove all of the assets which were subject to the Sale Agreement and the Lease Agreement before the Bankruptcy was filed.

180.    Approximately two days before the Bankruptcy was filed, Sun Air, with

the assistance and cooperation of the Debtor, removed three shipping containers of assets from the Debtor's hangars and shipped them to Denmark.

181.     These assets are property of the bankruptcy estate.

182.     A reasonably prudent person would not have contacted Sun Air and advised them to remove these assets and Hill and Lundberg were grossly negligent in doing so.

183.     A reasonably prudent person would not have allowed Sun Air to appear on site and remove these assets and Hill and Lundberg were grossly negligent in allowing Sun Air to do so.

184.     By advising Sun Air to remove these assets, allowing Sun Air to remove these assets, and/or assisting Sun Air in the removal of these assets, Hill and Lundberg each breached his fiduciary duty of care.

185.     In their actions, Hill and Lundberg did not exercise proper business judgment because they acted with gross negligence as set forth herein, they were self-interested as set forth herein, and/or they acted in bad faith as set forth herein.

186.     As a result of this breach of fiduciary duty, the Debtor has suffered damages for which Hill and Lundberg are liable.

## FOR A FIFTH CAUSE OF ACTION
**(Breach of Fiduciary Duties of Loyalty by Hill and Lundberg re: Sun Air Removal of Equipment – Self-Dealing)**

187.     The Trustee repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth verbatim herein.

188.     As of February 23, 2012 and continuing until the present, Lundberg was and is an officer of Sun Air.

189.     From December 12, 2011 to the present, YJM and Flying Low are the only two partners in a separate business venture, CCS.

190.     Upon information and belief, Lundberg is the 100% owner of YJM and Hill is the 100% owner of Flying Low.

191.     As directors and/or officers of the Debtor, Hill and Lundberg each owed the Debtor a fiduciary duty of loyalty, which required Hill and Lundberg to each discharge his duties as director and/or officer in good faith and to refrain from engaging in conduct that would injure the Debtor.

192.     This fiduciary duty was also owed to the creditors as a result of the Debtor's insolvency.

193.     Hill's and Lundberg's fiduciary duty of loyalty also required them each not to engage in self-dealing to the detriment of the Debtor.

194.     Upon becoming aware that the Debtor would probably be filing bankruptcy very soon, Hill contacted Lundberg and warned him that Sun Air should remove all of the assets which were subject to the Sale Agreement and the Lease Agreement before the Bankruptcy was filed.

195.     Approximately two days before the Bankruptcy was filed, Sun Air, with the assistance and cooperation of the Debtor, removed three shipping containers of assets from the Debtor's hangars and shipped them to Denmark.

196.     Lundberg directed such removal on behalf of Sun Air.

197.     These assets are property of the bankruptcy estate.

198.     Hill's actions were in his own self-interest and were to protect his existing business venture with Lundberg with CCS, which was involved in the airline

industry.

199.     Lundberg's actions were in his own self-interest and were to protect his

employer, Sun Air.

200.     By advising Sun Air to remove these assets, allowing Sun Air to remove

these assets, and/or assisting Sun Air in the removal of these assets, Hill and

Lundberg each breached his fiduciary duty of loyalty.

201.     As a result of this breach of fiduciary duty, the Debtor has suffered

damages for which Hill and Lundberg are liable.

## **FOR A SIXTH CAUSE OF ACTION**
### **(Breach of Fiduciary Duties of Care by the Defendants re: Insider Loans)**

202.     The Trustee repeats and realleges the allegations contained in the

preceding paragraphs as if fully set forth verbatim herein.

203.     As directors of the Debtor, Defendants owed the Debtor fiduciary duties of

care, which required Defendants to make informed business decisions and act

with the care that a reasonably prudent person in a like position would exercise

under similar conditions.

204.     This fiduciary duty was also owed to the creditors as a result of the

Debtor's insolvency.

205.     After the Initial Loans, the Original Directors, either directly or through

entities, have loaned the Debtor over $690,000 in unsecured loans.

206.     As of February 23, 2015 until the Petition Date, the Defendants, either

directly or through entities, have loaned the Debtor over $630,000 in unsecured

loans.

207.     These loans had high interest rates and financing fees.

208.     These loans purported to be secured by accounts receivable, but the documents did not properly create security interests and they were not properly perfected.

209.     Upon information and belief, the insider loans created a cycle of dependency, with high interest rates, for the personal benefit of the Original Directors.

210.     Each of these loans was repaid in full within a few months of being made despite non-payment of the Debtor's other creditors.

211.     If the Debtor had been properly capitalized at the outset or at any time, these insider loans would not have been necessary.

212.     A reasonably prudent person would not have caused the Debtor to obtain these loans, as a reasonably prudent person would have advised the owners of the Debtor to infuse adequate capital or would have sought other methods of capitalization and/or financing.

213.     A reasonably prudent person would not have caused the Debtor to repay these loans prior to the repayment of its other creditors.

214.     By allowing the Debtor to repay these insider loans, the Defendants breached their fiduciary duties of care.

215.     In their actions, the Defendants did not exercise proper business judgment because they acted with gross negligence as set forth herein, they were self-interested as set forth herein, and/or they acted in bad faith as set forth herein.

216.     As a result of these breaches of fiduciary duty, the Debtor has suffered damages for which the Defendants are liable.

## FOR A SEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duties of Loyalty by the Original Directors re: Insider Loans – Self-Dealing)

217.     The Trustee repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth verbatim herein.

218.     As directors of the Debtor, the Original Directors owed the Debtor fiduciary duties of loyalty, which required the Original Directors to discharge their duties as directors and/or officers in good faith and to not engage in conduct that would injure the Debtor.

219.     This fiduciary duty was also owed to the creditors as a result of the Debtor's insolvency.

220.     The Original Directors' fiduciary duties of loyalty also required them to not engage in self-dealing to the detriment of the Debtor.

221.     After the Initial Loans, the Original Directors, either directly or through entities, have loaned the Debtor over $690,000 in unsecured loans.

222.     These loans had high interest rates and financing fees.

223.     Each of these loans was repaid in full within a few months of being made to the detriment of the Debtor's other creditors.

224.     If the Debtor had been properly capitalized at the outset, these insider loans would not have been necessary.

225.     The Original Directors' actions were in their own self-interests and were calculated to insure that the Original Directors were repaid before any of the Debtor's other creditors.

226.     By insuring that their unsecured loans would be repaid ahead of all other

creditors, the Original Directors engaged in self-dealing and breached their fiduciary duties of loyalty.

227.    In their actions, the Defendants did not exercise proper business judgment because they acted with gross negligence as set forth herein, they were self-interested as set forth herein, and/or they acted in bad faith as set forth herein.

228.    As a result of these breaches of fiduciary duty, the Debtor has suffered damages for which the Original Directors are liable.

## FOR AN EIGHTH CAUSE OF ACTION
### (Breach of Fiduciary Duties of Care by the Original Directors re: KNH Air Logistics, LLC)

229.    The Trustee repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth verbatim herein.

230.    As directors of the Debtor, the Original Directors owed the Debtor fiduciary duties of care, which required the Original Directors to make informed business decisions and act with the care that a reasonably prudent person in a like position would exercise under similar conditions.

231.    This fiduciary duty was also owed to the creditors as a result of the Debtor's insolvency.

232.    The Original Directors owned Logistics.

233.    Logistics removed parts from aircraft and sold those parts to the Debtor.

234.    Logistics used the Debtor's hangars, employees, and tooling and equipment to perform its services.

235.    Logistics did not compensate the Debtor for the use of its hangars, employees, or tooling and equipment.

236.         Logistics did receive compensation from the Debtor for airplane parts that it removed from planes and sold to the Debtor.

237.         Logistics was an unnecessary "middle man" that used the Debtor's employees and assets to remove parts from airplanes and then charged the Debtor for these parts.

238.         Logistics did not perform any services that the Debtor could not perform.

239.         The Debtor paid the expenses of Logistics, resulting in the profit being paid to Logistics while the debt remained with the Debtor.

240.         A reasonably prudent person would not have allowed Logistics to use the Debtor's hangars, employees, or tooling and equipment without adequate compensation to the Debtor, and the Original Directors were grossly negligent in doing so.

241.         A reasonably prudent person would not have paid Logistics for services that the Debtor could have performed, and the Original Directors were grossly negligent in doing so.

242.         The Original Directors breached their fiduciary duties of care.

243.         In their actions, the Original Directors did not exercise proper business judgment because they acted with gross negligence as set forth herein, they were self-interested as set forth herein, and/or they acted in bad faith as set forth herein.

244.         As a result of these breaches of fiduciary duty, the Debtor has suffered damages for which the Original Directors are liable.

## FOR A NINTH CAUSE OF ACTION
**(Breach of Fiduciary Duties of Loyalty by the Original Directors re: KNH Air Logistics, LLC – Self-Dealing)**

245.     The Trustee repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth verbatim herein.

246.     As directors of the Debtor, the Original Directors owed the Debtor fiduciary duties of loyalty, which required the Original Directors to discharge their duties as directors and/or officers in good faith and to not engage in conduct that would injure the Debtor.

247.     This fiduciary duty was also owed to the creditors as a result of the Debtor's insolvency.

248.     The Original Directors owned Logistics.

249.     Logistics removed parts from aircraft and sold those parts to the Debtor.

250.     Logistics used the Debtor's hangars, employees, and tooling and equipment to perform its services.

251.     Logistics did not compensate the Debtor for the use of its hangars, employees, or tooling and equipment.

252.     Logistics did receive compensation from the Debtor for airplane parts that it removed from planes and sold to the Debtor.

253.     Logistics was an unnecessary "middle man" that used the Debtor's employees and assets to remove parts from airplanes and then charged the Debtor for these parts.

254.     Logistics did not perform any services that the Debtor could not perform.

255.     The Original Directors' actions were in their own self-interest and to the detriment of the Debtor.

256.     The Original Directors breached their fiduciary duties of loyalty.

257.     As a result of these breaches of fiduciary duty, the Debtor has suffered

damages for which the Original Directors are liable.


## FOR A TENTH CAUSE OF ACTION
**(Breach of Fiduciary Duties of Loyalty by the Original Directors re: KNH Air Logistics, LLC – Usurpation of Corporate Opportunity)**

258.     The Trustee repeats and realleges the allegations contained in the

preceding paragraphs as if fully set forth verbatim herein.

259.     As directors of the Debtor, the Original Directors owed the Debtor

fiduciary duties of loyalty, which required the Original Directors to discharge

their duties as directors and/or officers in good faith and to not engage in conduct

that would injure the Debtor.

260.     This fiduciary duty was also owed to the creditors as a result of the

Debtor's insolvency.

261.     The Original Directors' fiduciary duties of loyalty also required them not

to usurp the Debtor's corporate opportunities.

262.     The Original Directors owned Logistics.

263.     Logistics removed parts from aircraft and sold those parts to the Debtor.

264.     Logistics used the Debtor's hangars, employees, and tooling and

equipment to perform its services.

265.     Logistics did not compensate the Debtor for the use of its hangars,

employees, or tooling and equipment.

266.     Logistics did receive compensation from the Debtor for airplane parts that

it removed from planes and sold to the Debtor.

267.     Logistics was an unnecessary "middle man" that used the Debtor's employees and assets to remove parts from airplanes and then charged the Debtor for these parts.

268.     Logistics did not perform any services that the Debtor could not perform.

269.     The opportunity for the Debtor to perform the services that Logistics performed represents a corporate opportunity that could have been exercised by the Debtor.

270.     The Debtor had an interest in the opportunity to perform the services performed by Logistics and would have negotiated with the third parties to perform said services but for the Original Directors' actions in negotiating on behalf of Logistics to perform the services.

271.     The Debtor was capable of performing the services.

272.     The services provided by Logistics were the type of services routinely provided by the Debtor, and the Debtor possessed all of the necessary equipment and hangar space to perform the services.

273.     By causing Logistics to contract with third parties to perform services that the Debtor routinely performed, the Original Directors were placed in a position inimical to their duties to the Debtor, resulting in a usurpation of the Debtor's corporate opportunity and breaches of their fiduciary duties of loyalty.

274.     As a result of these breaches of fiduciary duty, the Debtor has suffered damages for which the Original Directors are liable.

## FOR AN ELEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty of Care by Hill re: Hill's Removal of Assets)

275.     The Trustee repeats and realleges the allegations contained in the

preceding paragraphs as if fully set forth verbatim herein.

276.     As a director and officer of the Debtor, Hill owed the Debtor the fiduciary duty of care, which required Hill to make informed business decisions and act with the care that a reasonably prudent person in a like position would exercise under similar conditions.

277.     This fiduciary duty was also owed to the creditors as a result of the Debtor's insolvency.

278.     A few days prior to the Bankruptcy filing, Hill removed assets of the Debtor from the Debtor's property and stored them at his house.

279.     These assets had a substantial value and their removal was not initially disclosed to the Trustee.

280.     Upon discovery of such removal, the Trustee requested return of the assets but was refused.

281.     As a result, the Trustee was required to coordinate the return of these assets to the Debtor's hangars and to pay for their recovery.

282.     There was no legitimate business reason for removing these assets to Hill's house.

283.     A reasonably prudent person would not have allowed someone to remove these assets from the Debtor's hangars and Hill was grossly negligent in doing so.

284.     Hill breached his fiduciary duty of care.

285.     By his actions, Hill did not exercise proper business judgment because he acted with gross negligence as set forth herein, he was self-interested as set forth herein, and/or he acted in bad faith as set forth herein.

286.    As a result of this breach of fiduciary duty, the Debtor has suffered

damages for which Hill is liable.


**FOR A TWELFTH CAUSE OF ACTION**
**(Avoidance of Preferential Transfer Pursuant to 11 U.S.C. § 547(b) –**
**as to Hill)**

287.    The Trustee repeats and realleges the allegations contained in the

preceding paragraphs as if fully set forth verbatim herein.

288.    At the time of the Hill Transfers, Hill claimed to be a creditor of the

Debtor with a right to payment on account of an obligation owed to Hill by the

Debtor.

289.    The Hill Transfers were to or for the benefit of Hill in that the Hill

Transfers either reduced or fully satisfied a debt then owed by the Debtor to Hill.

290.    The Hill Transfers were made on account of an antecedent debt because

the Hill Transfers were on account of a debt obligation which the Debtor was

legally bound to pay before the Hill Transfers were made.

291.    The Debtor was insolvent at all times when the Hill Transfers were made

in that the value of the Debtor's property was less than the sum of the Debtor's

debts.

292.    As a result of the Hill Transfers, Hill received more than he would have

received if: (i) the Debtor's case was a case under Chapter 7 of the United States

Bankruptcy Code; (ii) the Hill Transfers had not been made; and (iii) Hill

received payment of its debt under the provisions of the Bankruptcy Code.

293.     In accordance with the foregoing, the Hill Transfers are avoidable pursuant to 11 U.S.C. § 547(b).

## FOR A THIRTEENTH CAUSE OF ACTION
### (Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550 – as to Hill)

294.     The Trustee repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth verbatim herein.

295.     The Trustee is entitled to avoid the Hill Transfers pursuant to 11 U.S.C. § 547(b).

296.     Hill was the initial transferee of the Hill Transfers.

297.     Pursuant to 11 U.S.C. § 550(a)(1), the Trustee is entitled to recover from Hill the Hill Transfers in the total amount of at least $60,503.95.

## FOR A FOURTEENTH CAUSE OF ACTION
### (Avoidance of Preferential Transfer Pursuant to 11 U.S.C. § 547(b) – As to Kamenz)

298.     The Trustee repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth verbatim herein.

299.     At the time of the Transfers, Kamenz claimed to be a creditor of the Debtor with a right to payment on account of an obligation owed to Kamenz by the Debtor.

300.     The Kamenz Transfers were to or for the benefit of Kamenz in that the Kamenz Transfers either reduced or fully satisfied a debt then owed by the Debtor to Kamenz.

301.     The Kamenz Transfers were made on account of an antecedent debt because the Kamenz Transfers were on account of a debt obligation which the Debtor was legally bound to pay before the Kamenz Transfers were made.

302.      The Debtor was insolvent at all times when the Kamenz Transfers were made in that the value of the Debtor's property was less than the sum of the Debtor's debts.

303.      As a result of the Kamenz Transfers, Kamenz received more than he would have received if: (i) the Debtor's case was a case under Chapter 7 of the United States Bankruptcy Code; (ii) the Transfers had not been made; and (iii) Kamenz received payment of its debt under the provisions of the Bankruptcy Code.

304.      In accordance with the foregoing, the Kamenz Transfers are avoidable pursuant to 11 U.S.C. § 547(b).

## FOR A FIFTEENTH CAUSE OF ACTION
### (Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550 – as to Kamenz)

305.      The Trustee repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth verbatim herein.

306.      The Trustee is entitled to avoid the Kamenz Transfers pursuant to 11 U.S.C. § 547(b).

307.      Kamenz was the initial transferee of the Kamenz Transfers.

308.      Pursuant to 11 U.S.C. § 550(a)(1), the Trustee is entitled to recover from Kamenz the Kamenz Transfers in the total amount of at least $36,903.67.

WHEREFORE, having fully set forth her Complaint, the Trustee prays that the Court issue an Order and Judgment granting the following relief:

1.  As to the First Cause of Action, damages in an amount to be determined at trial against Defendants for breaches of their fiduciary duties related to insolvency, undercapitalization, and corporate waste;

2.  As to the Second Cause of Action, damages in an amount to be determined at trial against the Original Directors for breaches of their fiduciary duties related to the Sale Agreement with Sun Air;

3.  As to the Third Cause of Action, damages in an amount to be determined at trial against the Original Directors for breaches of their fiduciary duties related to the Lease Agreement with Sun Air;

4.  As to the Fourth Cause of Action, damages in an amount to be determined at trial against Hill and Lundberg for breach of their fiduciary duties related to Sun Air's removal of assets prior to the Bankruptcy;

5.  As to the Fifth Cause of Action, damages in an amount to be determined at trial against the Defendants for breaches of their fiduciary duties related to Sun Air's removal of assets prior to the Bankruptcy;

6.  As to the Sixth Cause of Action, damages in an amount to be determined at trial against the Defendants for breaches of their fiduciary duties with regard to insider loans;

7.  As to the Seventh Cause of Action, damages in an amount to be determined at trial against the Original Directors for breaches of their fiduciary duties with regard to insider loans;

8.  As to the Eighth Cause of Action, damages in an amount to be determined at trial against the Original Directors for breaches of their fiduciary duties with regard to Logistics;

9.  As to the Ninth Cause of Action, damages in an amount to be determined at trial against the Original Directors for breaches of their fiduciary duties with

regard to Logistics;

10. As to the Tenth Cause of Action, damages in an amount to be determined at trial against the Original Directors for breach of their fiduciary duties with regard to Logistics;

11. As to the Eleventh Cause of Action, damages in an amount to be determined at trial against Hill for breach of his fiduciary duty with regard to the removal of assets prior to the Bankruptcy filing;

12. As to the Twelfth Cause of Action, avoidance of the preferential transfers to Hill;

13. As to the Thirteenth Cause of Action, recovery of the value of such avoided transfers from Hill;

14. As to the Fourteenth Cause of Action, avoidance of the preferential transfers to Kamenz;

15. As to the Fifteenth Cause of Action, recovery of the value of such avoided transfers from Kamenz; and

16.  For such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED on this the 18th day of January, 2016, at Columbia, South Carolina.

BARTON LAW FIRM, P.A.


BY:    /s/Barbara George Barton_____
          Barbara George Barton, #1221
          Adam J. Floyd, #10749
          Christine E. Brimm, #6313
          Barton Law Firm, P.A.
          Attorneys for the Trustee
          1715 Pickens Street

P. O. Box 12046
Columbia, South Carolina 29211
Tele: (803) 256-6582
Fax: (803) 779-0267

# EXHIBIT A

## CORPORATE RESOLUTION
## OF
## KNH AVIATION SERVICES, INC.
### d/b/a AVCRAFT TECHNICAL SERVICES

WHEREAS, the undersigned are all the shareholders of **KNH Aviation Services, Inc. d/b/a AvCraft Technical Services**, a Delaware Corporation (the "Company"); and

WHEREAS, Company proposes to sell certain of its equipment to **Sun-Air of Scandinavia A/S**, a foreign corporation (the "Buyer") pursuant to the terms of that certain Equipment Purchase and Leaseback Agreement, dated November 22, 2011 (the "Purchase Agreement"), a copy of which has been circulated among the undersigned shareholders; and

WHEREAS, Buyer has agreed to purchase said equipment for **$ 200,000.00** pursuant to the terms of the Purchase Agreement, which the Company finds reasonable and in the best interest of the Company and its shareholders.

NOW, THEREFORE, BY AND THROUGH THE UNDERSIGNED SHAREHOLDERS, BE IT:

**RESOLVED THAT** the Company hereby agrees to sell certain of its equipment listed on the EXHIBIT attached to the Purchase Agreement to Buyer for $ 200,000.00 pursuant to the terms of the Purchase Agreement; and

**RESOLVED THAT**, in any present and in any future dealings between the Company and the Buyer relating to the transaction authorized herein, any of the Persons shown below (the "Authorized Agent") is authorized, on behalf of the Company, to transact with Buyer and to execute any documents, and take any further actions reasonably necessary to carry out the Resolutions herein:

| NAME | SPECIMEN SIGNATURE | TITLE |
|---|---|---|
| Michael B. Hill | *[signature]* | President |

**RESOLVED THAT**, all prior acts, dealings and undertakings with the Buyer by the Company and those on behalf of the Company by the individual named above are hereby ratified and confirmed.

**RESOLVED THAT**, the foregoing resolutions and the provisions hereof are in conformity with the organizational documents (e.g., articles of incorporation, bylaws, etc.) of the Company and the name and specimen signature of above-named persons is are authorized.

IN WITNESS WHEREOF, the undersigned shareholders of **KNH Aviation Services, Inc. d/b/a AvCraft Technical Services**, hereby sign and approve this Resolution as of *November 21*, 2011.

| Indaer International, Inc. | Flying Low, LLC | DIK, LLC |
|---|---|---|
| By: Derek Nice Its: President and CEO | By: Michael B Hill Its: Managing Member | By: Donald Kamenz Its: Managing Member |

## CORPORATE RESOLUTION
### OF
## KNH AVIATION SERVICES, INC.
### d/b/a AVCRAFT TECHNICAL SERVICES

WHEREAS, the undersigned are all the shareholders of **KNH Aviation Services, Inc. d/b/a AvCraft Technical Services**, a Delaware Corporation (the "Company"); and

WHEREAS, Company proposes to sell certain of its equipment to **Sun-Air of Scandinavia A/S**, a foreign corporation (the "Buyer") pursuant to the terms of that certain Equipment Purchase and Leaseback Agreement, dated November _____, 2011 (the "Purchase Agreement"), a copy of which has been circulated among the undersigned shareholders; and

WHEREAS, Buyer has agreed to purchase said equipment for **$ 200,000.00** pursuant to the terms of the Purchase Agreement, which the Company finds reasonable and in the best interest of the Company and its shareholders.

NOW, THEREFORE, BY AND THROUGH THE UNDERSIGNED SHAREHOLDERS, BE IT:

**RESOLVED THAT** the Company hereby agrees to sell certain of its equipment listed on the EXHIBIT attached to the Purchase Agreement to Buyer for $ 200,000.00 pursuant to the terms of the Purchase Agreement; and

**RESOLVED THAT**, in any present and in any future dealings between the Company and the Buyer relating to the transaction authorized herein, any of the Persons shown below (the "Authorized Agent") is authorized, on behalf of the Company, to transact with Buyer and to execute any documents, and take any further actions reasonably necessary to carry out the Resolutions herein:

| NAME | SPECIMEN SIGNATURE | TITLE |
|---|---|---|
| Michael B. Hill | | President |

**RESOLVED THAT**, all prior acts, dealings and undertakings with the Buyer by the Company and those on behalf of the Company by the individual named above are hereby ratified and confirmed.

**RESOLVED THAT**, the foregoing resolutions and the provisions hereof are in conformity with the organizational documents (e.g., articles of incorporation, bylaws, etc.) of the Company and the name and specimen signature of above-named persons is are authorized.

IN WITNESS WHEREOF, the undersigned shareholders of **KNH Aviation Services, Inc. d/b/a AvCraft Technical Services**, hereby sign and approve this Resolution as of _____, 2011.

| Indaer International, Inc. | Flying Low, LLC | DIK, LLC |
|---|---|---|
| By: Derek Nice<br>Its: President and CEO | By: Michael B Hill<br>Its: Managing Member | By: Donald Kamenz<br>Its: Managing Member |

# **<u>EXHIBIT B</u>**



**Board of Directors Meeting**
**KNH Aviation Services, Inc d/b/a AvCraft Technical Services**
**Thursday, February 23, 2012 at 11:00 a.m.**

Any conflict of interest must be declared at the time the meeting is called to order or at such time as one arises during the meeting

Chairman                          Recording Secretary              Directors
Derek Nice                        Carol Drew                       Mike Hill
                                                                   Donald Kamenz
                                                                   Derek Nice
                                                                   Carol Drew
                                                                   Jesper Lundberg

## Participate

Location: Myrtle Beach International Airport (offsite location) at Coastal Carolina Association of Realtors' boardroom located at, 951 Shine Avenue Myrtle Beach, South Carolina 29577

Date: February 23, 2012

Time: 11:15 a.m.

In Attendance: Tom Younan, CFO; Jesper Lundberg, Director; Donald Kamenz, Director; Derek Nice, Chairman of the Board and Director; Mike Hill, Director and President, Secretary and Treasurer of the Corporation ; and Carol Drew, Director.

Absentee: None
Total Board Members: Five

Motion to approval of agenda by all Board members – no objections

Mike motioned to elect new member to the board Jesper Lundberg. All board members accepted motion – no objections. Board of Directors signed the Resolution to accept Jesper Lundberg as a director.

## Agenda

Motion to approval of agenda by all Board members – no objections

11:15 a.m. Board meeting called to order by Derek Nice

Business Arising

No business arising brought before the Board for follow-up from the prior Board of Directors Meeting.

There were no minutes read from the last board meeting so there was no motion carried or failed for those minutes.

1

New Business
Derek Nice – time allotment 20 minutes

Discussions with the Board about strategic direction of the company. He briefly discussed fulfilling the risk-oversight responsibilities of the Board. Other responsibilities include: delegation and termination; compliance; performance; and protected interests of AvCraft's shareholders; stakeholders, employees, customers, suppliers, creditors and its community.
"Bright Red Line of Governance" Approach, Board oversees and Management manages AvCraft.
Hand out by Derek: Board Orientation and Risk Management information.

Tom Younan – time allotted 20 minutes
- Strategic Matters for Discussion/Decision
- Financial and Operating Review
- Review of 2011 operating results and financial indicators

Strategic Matters for Discussion
Tom's Introduction – business changed dramatically with new owners. It moved and grew rapidly. The volume of work and new airframes increased.  AvCraft challenged with the growth creating inefficiencies for the company. Commercial versus Corporate showed a/c part sales much lower and man hr rates lower.

Last quarter reduction in headcount improved margins and change in supervisory levels continues to show positive trends.

Q1 – Over view by Tom. Cost continues to be analyzed and controlled to ensure margin performance. Exploring funding. Focus is on creating higher efficiencies in operations to control costs. Looking into Q2 to see more improved results.

Financial and Operating Review
Tom reviewed financials – financial results (hand out).
Statement of Operation cost jumped and sales jumped in 2011 versus 2010. Chairman asked about history and a comparison – Tom and Mike talked about the history and challenges. Jasper talked about history of the Dornier.

Operating Results
Tom talked about Statements of Operations, year to date period ended December 31, 2011 and 2010 and for the three months ended December 31, 2011 and 2010; Balance Sheets as at December 31, 2011 and 2010; Statement of Cash Flow for 2010 and 2011. Questions asked by board members for clarification.

Tom reviewed Preliminary Estimate year ending 12/31/2011; and reviewed Direct Costs / Margin year ending 12/31/2011.

Tom reviewed Operating Income / EBITDA year ending 12/31/2011.

Tom Younan – time allotted 20 minutes
- Review of Key Performance Indicators and Outlook.

Tom reviewed the overview of 2012 assumptions including the outlook and the key performance targets. Discussions of existing and new projects challenges and opportunities and the focus of AvCraft ensuring it keeps infrastructure and the indirect overhead growth controlled.

Derek talked about the Skyline Summary short term and long term customers and what customers and airframe type we have. Also, what we will target for Q1 2012 to Q1 2013.

Tom Younan – time allotted 10 minutes
- Quarterly Compliance Certificate.

Derek had the Quarterly Compliance Certificate reviewed and signed by Mike and Donald. All other board members reviewed. Tom would like to do due diligence prior to signing. Mindy Pavilonis, AvCraft's HR Manager, will sign the drug enforcement compliance portion of the certificate, as well. Chair requested a copy of the Certificate to be sent to all board members after everyone has signed. Mike and Donald both signed FAA parts 145 Compliance portion together.

Tom Younan – time allotted 10 minutes
- Review and approval of auditor engagement letter.

Tom handed out copies of the Auditor Engagement letter to all board members for each one to review. Tom expressed that the auditors work for the board and not AvCraft. Last year's fee to Elliott Davis applies again this year.  The letter is to confirm that the AvCraft board agrees with Elliott Davis's understanding of the terms and objectives of their engagement with us.

Board motion to accept Mike Hill as the signing authority on behalf of the board. Motion carried by all board members – no objection.

Derek Nice – time allotted 60 minutes.
- Strategic Plan Update/Review.

Business development opportunity to form a venture between Sun Air and AvCraft. Conversations have been going on to discuss the opportunities between the two parties. Due diligence has to be done. AvCraft and Sun Air are in the preliminary stages of talk.

Mike will take the lead, and Mike and Jesper will coordinate their efforts and structure a plan together that can be presented to the board.

Donald Kamenz – time allotted 20 minutes
- Marketing Plan Update/Review.

Donald reviewed our marketing opportunities – past, present and future. Discussed aircraft and customer focus.

Donald Kamenz - time allotted 20 minutes
- Continuous Improvement Plan update.

Donald discussed past turbulence in our operation and addressed the "Continuous Improvement Plan" that has been implemented. Focus: training initiatives; hiring highly skilled mechanics; encouraging managers, supervisors and leads to empower employees; increasing productivity and efficiencies; understanding past experience; and positive reinforcement.

Donald Kamenz - time allotted 20 minutes
- Quality Assurance review.

Presented by Donald -Talked about FAA, two incidents of which one was self disclosed. One investigation is still open with the FAA. One incident resolved and negligence was not a factor in the finding. Customer is under scrutiny for not disclosing information.

Major audit done and AvCraft given stamp of approval. FAA was very pleased with the operation.

Jesper Lundberg – time allotted 40 minutes
- Risk Management Strategy.

Risk and liability chart presented as a brain storming and teaser exercise. Jesper will provide a work package for members to review. Discussion included: Implementation of risk management; Jesper background involving risk management; employee protection; business protection; management style starting at the top to the bottom; cultural spirit; communications; project management; finance; and internal and external risk.

Further detailed discussion to be held in a meeting outside our board meetings to talk about managing risk in each department. Mike and Jesper will further discuss as to plans to implement Risk Management going forward. Meeting date to be determined.

Tom Younan – time allotted 10 minutes
- Review of amended Delegated Authorities.

The matrix which was distributed to the board by Tom outlined the approval and authorization guidance for all of AvCraft's activities and transaction processes. XRCA means: A approval; R recommends; C concur; and A advised only.

The board will review the XRCA chart and give their remarks back to Mike. Mike will take the lead. Mike will provide feedback for Tom based on the board member's recommendations.


Derek Nice – time allotted 10 minutes
- Date and time of next board meeting.

Next board meeting Tuesday, April 24th, agreed by the Board. There will be a review of the financial statements and the preliminary results for 2012.

Jesper and Mike to come up with an agenda on cash flow implementation, input from Jesper to present to Tom next week.

Jesper and Carol In Camera 3 minutes to discuss feelings of management team. No issues presented at this time.

Chair motioned to close the Board Meeting. All board members in favor – no objections.

Board Meeting adjourned at 4:00 p.m.

# EXHIBIT C

# *AvCraft*

March 3, 2015

Niels Sundberg
President and CEO
Sun-Air of Scandinavia A/S
Cumulusvej 10
DK-7190 Billund
Denmark

Re: Machinery and Equipment Under Equipment Lease With Option to Purchase

Dear Niels:

This letter concerns measures to protect the machinery and equipment under the Equipment Lease With Option to Purchase between KNH Aviation Services, Inc., d/b/a AvCraft Technical Services ("KNH"), as lessee, and Sun-Air of Scandinavia A/S ("Sun-Air"), as lessor. KNH's current situation requires immediate action in moving the machinery and equipment to another location, or in satisfying conditions for the continued use of a portion of the premises now leased by KNH from Horry County, South Carolina. KNH does not have the ability to move and store the machinery and equipment, or to extend its use of the leased premises, without funding from Sun-Air.

KNH was unsuccessful in reaching an agreement to modify its lease with Horry County for the continued use and occupation of the three hangar buildings at the Myrtle Beach airport facilities. As a result, KNH is forced to vacate two of the hangar buildings (Hangar Building #352 and Hangar Building # 355) by March 7, 2015, and to vacate the third hangar building (Hangar Building # 358) by March 22, 2015. Further use of Hangar Building # 358 may be allowed if certain conditions are met, which conditions include payment of amounts due to Horry County.

Horry County filed an eviction action against KNH with respect to the three leased hangar buildings and leased automobile parking spaces. KNH could not prevent the eviction and, instead, had to negotiate for an allowed period of time to move the personal property items from the leased premises. The negotiated terms are stated in the attached Consent Order of Settlement filed in Horry County's eviction action.

At this time, Sun-Air needs to do one of the following: (1) move its machinery and equipment by March 22, 2015, (2) provide funds to KNH to move it to another location, or (3) arrange a payment that will enable an agreement with Horry County to extend the period of occupation and use of Hangar Building # 358. KNH does not have the ability to move the machinery and equipment, to store it indefinitely, or to make payments to Horry County as required to extend the time of KNH's occupation of the leased premises.

KNH intends to proceed with an orderly liquidation of its assets to pay its creditors to the extent possible.  KNH may file a bankruptcy case under Chapter 7 of the U.S. Bankruptcy Code (11 U.S.C. § 101, *et seq.*), but it hopes to avoid the necessity of such a filing.  KNH believes that it can liquidate its assets for better value than could a bankruptcy trustee, that the costs of a bankruptcy would reduce funds available for payment of creditors, and that the creditors will likely receive payment from this type of liquidation much sooner than they would in a bankruptcy case (where it could easily be two years or longer before a distribution would be made to creditors), and KNH will proceed with this approach.

In the meantime, however, it is urgent that the property items located in the premises leased from Horry County be moved from the premises by March 22, 2015.

Please advise me as soon as possible on Sun-Air's response to this need to provide for the movement or disposition of its machinery and equipment.  KNH would like to see Sun-Air's rights and interests in its machinery and equipment protected.

I hope to hear from you soon.

With best regards,

Michael B. Hill
President
AvCraft Technical Services
3301 Mustang Street
Myrtle Beach, SC 29577

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| KNH Aviation Services, Inc. d/b/a | ) | Case # 15-01641-dd |
| AvCraft Technical Services, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Michelle L. Vieira as Chapter 7 Trustee for | ) | |
| KNH Aviation Services, Inc. d/b/a AvCraft | ) | |
| Technical Services, | ) | |
| | ) | Adv. Pro. No.        15-80170-dd |
| Plaintiff, | ) | |
| | ) | Consolidated With |
| vs. | ) | Adv. Pro. Nos.      15-80171-dd |
| | ) | 15-80178-dd |
| Michael Hill; Donald Kamenz; Derek Nice; | ) | 15-80179-dd |
| Carol Drew; and Jesper Lundberg, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CERTIFICATE OF SERVICE**

I, Megan Jankowski, hereby certify that on behalf of Barbara George Barton, District Court I.D. #1221, Attorney for Michelle L. Vieira, Chapter 7 Trustee, I served a copy of the **AMENDED COMPLAINT** in the above-captioned matter, **filed on January 18, 2016**, on the Defendants' attorney, Amy H. Wooten, as shown below, who represents Michael Hill; Donald Kamenz; Derek Nice; Carol Drew; and Jesper Lundberg, via U.S. Mail on January 18, 2016.

Amy H. Wooten
Brown Law, LLP
4130 Parklake Ave, Suite 130
Raleigh, NC 27612

BARTON LAW FIRM, P.A.

/s/ Megan Jankowski
1715 Pickens Street
Post Office Box 12046
Columbia, South Carolina  29211-2046
January 18, 2016                          TEL:  803.256.6582